*Court of Common Pleas, Lebanon County, October 21st, 1858.*

### COLEMAN *v.* COLEMAN ET AL.

Tenants in common of mines are liable to account to each other both at common law, under the statute of 4 Anne, c. 16, and under section 24 of the act of 25th April, 1850.

Taking ore from the surface of the earth or shallow pits is as much mining within the meaning of the law, as if it were dug from deep mines.

Tenants in common of an ore-bank can demand an account from their co-tenants, whenever they take more than their share of ore; they need not wait until the whole bank is exhausted. They are liable to each other for ore used by themselves as well as for that sold. The fact that by agreement each tenant in common was given his own ore-pit does not debar them from demanding an account from each other. The fact that all parties continued to use these ore-banks for a long period of years without asking an account will not preclude any of them from demanding it. Any presumption arising from this long acquiescence may be rebutted by the fact that the respondent is now using and selling much larger quantities of ore than formerly.

BY THE COURT.—The plaintiff has filed his bill on the equity side of this court, demanding that an account be rendered by the defendants of certain iron and copper ore sold and used by them from lands of which they are tenants in common.

The bill and various answers as filed present no disputed facts, but several important legal questions are raised for the consideration of the court.

The ores were taken from "Cornwall Ore-Banks and Mine-Hills," situate in this county; twenty-five ninety-sixth parts of which are owned by the plaintiffs, a like quantity by William Coleman, thirty ninety-sixth parts by Robert and G. Dawson Coleman, and sixteen ninety-sixth parts by Edward B. and Clement B. Grubb, all holding as tenants in common.

William Coleman presents no answer, and as to him the bill must be taken *pro confesso*. He is probably made a party for mere form. Messrs. Grubbs file a full answer, raising several legal objections, but decline taking any part on the hearing, averring that to them it is a matter of indifference, as they will gain more than lose by an account, and if on the whole it is lawful are willing that one be taken. The matter is mainly resisted by Messrs. Robert and G. Dawson Coleman. It becomes our duty to decide the legal rights of all the parties.

Peter Grubb was originally the sole owner of "Cornwall Ore-Banks and Mine-Hills," and of several establishments in their vicinity, where the ore was manufactured into iron.

The property descended in unequal parts to his two sons, Curtis and Peter; the former of whom conveyed to his son Peter, one undivided sixth part of the mine-hills, together with certain portions of the real estate. Peter Grubb subsequently sold his interest in the ore-banks, together with certain portions of the real

[Coleman v. Coleman et al.]

estate, to Robert Coleman, reserving the right to take at all times sufficient quantity of iron ore for the supply of one furnace, at the election of the said Peter Grubb, Jr., his heirs and assigns forever. In process of time Robert Coleman became seized of four other sixth parts of these ore-banks, leaving to the descendants of the Messrs. Grubbs, the original owners, but one-sixth part thereof. The Messrs. Coleman, parties in these proceedings, deduce their title from Robert Coleman, and the Messrs. Grubbs from the original proprietors.

In the year 1786 an attempt was made to have partition of the several estates held in common by Robert Coleman and Messrs. Grubbs, including "Cornwall Ore-Banks and Mine-Hills," but it was found impossible to divide the ore-banks without doing great injustice to some of the parties, as all of the property was dependent on them for a supply of ore; it was therefore agreed that they should remain together and undivided as a tenancy in common, and a method of working the ore from the hills was agreed on, "that neither of the said parties, their agents, or workmen, shall interfere or interrupt either of the other parties at any mine-hole by them opened and occupied for the purpose of raising iron ore." It also appears that Robert Coleman and Messrs. Grubbs and their descendants continued to use the ore-banks and mine-hills as appurtenant to their respective estates, so parted and divided in 1787, down to a comparatively recent period, without any interruption or hindrance, or either of them being called on to account. Latterly, however, several of the respective owners have built new furnaces on other ground than that to which the ore-banks were originally held as appurtenant, and from the modern method of smelting iron with anthracite coal, immense quantities of ore is used, probably more per week by each anthracite furnace than monthly under the former system. Besides, it is conceded that Messrs. Robert and G. D. Coleman have for some years past made extensive sales of ore to other manufacturers of iron, a practice never previously pursued by any of the holders of these banks, and which the other tenants in common refuse to follow, deeming it highly inexpedient.

The Messrs. Grubbs also aver that under the reservation contained in the deed from Peter Grubb to Robert Coleman, of the right to take ore from the hills for one furnace, large quantities have been removed and consumed by Robison & Brooke, the present holders of that right, by assignment from the descendants of Peter Grubb, and that the ore so taken is a proper charge against those claiming under Robert Coleman the elder.

On the 13th of March, 1849, Robert and G. Dawson Coleman entered into an article of agreement with Robert W. and William Coleman, by which they respectively agreed to account to each other, on the 1st of April of each year, for five years, next ensuing,

for all ores taken, used, or sold by them respectively, at the rate and price of fifty cents per ton, the estimate to be made against each, according to the proportion of their respective shares. Under this agreement, Robert and G. D. Coleman say that they have accounted for all ores taken or sold by them from the 1st day of April, 1848, to the 1st day of January, 1851, but no account has been taken since; and they further aver that when the agreement was made, it was understood between the parties thereto, that all claims for ores mined, taken, and carried away prior to the 1st of April, 1848, was abandoned. They deny all liability to account, except under that article of agreement.

The following objections have been raised in substance against the right of the plaintiff to sustain his bill, and the legal liability of the defendants to account.

*First.* Tenants in common are not liable to account to each other by the common law.

*Second.* There is no allegation that these are mines, or the business as conducted mining, and the description of the method of obtaining the ore shows that they are not mines, and that it is not procured by mining.

*Third.* The case does not come within the 27th section of the stat. 4 Anne, chap. 16, nor the 24th section of the act of 25th of April, 1850.

*Fourth.* It is not alleged that the defendants or any of them have taken more than their just share of the *whole mass of ore*, and if they have not, they cannot be called on to account, but the plaintiff's remedy is to help himself, and sell and dispose of the ore until the shares are equalized.

*Fifth.* Even if liable for the ore *sold*, the defendants cannot be asked to account for what they themselves *used*.

*Sixth.* The agreement of 1787 precludes all idea of accounting to each other; shows that they did not hold or work the mine-hills as tenants in common, but each was to have his separate mine-hole, from which he might take *ad libitum*, and for the ore so removed, not to be accountable to any one.

*Seventh.* The deposit of ore in these hills is, for all practical purposes, inexhaustible, and therefore it cannot be shown for generations to come, that either part owner has used more than his share, and until he does, he cannot be required to account under either the English statute or our own act of Assembly. And,

*Eighth.* That the long user of these ore-banks in the manner practiced by the respective owners, from 1787 down to the time of filing this bill, without any demand of an account, is conclusive against the plaintiff's right, and he is therefore precluded from asking it now.

We find it laid down in works of high authority, that by the

common law, one tenant in common had no remedy, by account or otherwise, against his co-tenant, who had taken all the profits of the land, or enjoyed the entire use of personal chattels (Coke's Lit. 199, b.; Thomas's Coke, vol. i, p. 906). If ejected from land, or prevented from taking possession by his co-tenant, he has his remedy by writ of *ejectione firmœ,* and if of personal chattels, by retaking them again as soon as he can have opportunity (Co. Lit. 200, a.). But if one destroy the chattel, the other can maintain an action against him (200 b.). Or if he commit waste on the land, an action of waste lieth by his companion (see Thomas's Coke, pp. 908, 9, 10, and 11, of top paging). But if one joint tenant or tenant in common make the other his bailiff or receiver of his moiety, he shall have account (Co. Lit. 206; see also 172 a.; Thomas's Coke, vol. iii, p. 376).

If one tenant in common destroy the corner-stones of land, the other shall have an action; so if he corrupt a river and render it unfit for use; so of a folding, if the other disturb it (C. Lit. 200 b.), and after a recovery in ejectment against his co-tenant, he shall have trespass for mesne profits (Wilson, 113). So he may not maintain waste for an injury (8 Term. Rep. 145; 1 Taunt. 247). But if timber be cut and sold, he can recover his share of the value (8 T. R. 145; 1 Taunt. 247). Although the weight of authority appears to be as above stated at law, yet in equity we find them held to account in some cases. Thus in Skinner, 230, Lord Keeper North says: "Four joint owners of a ship; three resolve to make a voyage, the fourth will not; the course is to go into the admiralty and there give security to answer for the ship, and they shall be discharged of the other. If the ship be lost, he shall not have his part unless he expressly prohibit the voyage, but if she return, he shall have an account of what she received, for it shall be intended the voyage was with his consent, without an express prohibition proved." If four tenants in common of land, and one stock the land and manage it, the rest shall have an account of the profits, and if a loss come, they shall bear a part decided 37 Chas. II, consequently not under the statute (see also, 1 Levinz, 219).

We are inclined to believe that equity has generally compelled an account between tenants in common of *mines,* both because mining is a species of *trade,* and also because the common property, when taken from the earth, is used or disposed of by the taker. If one tenant in common sell trees growing on the property, the other shall have an action for his half of their value (8 T. R. 145; 1 Taunt. 240, already cited; also 25 Wend. 409; 9 Pick. 34). Why shall he not have a like action for ore dug from the mine and sold? If one tenant in common of a dovecote destroy all the doves, the other shall have trover, and if instead of destroying, he convert them to his own use, consume them, is his co-tenant

[Coleman *v.* Coleman et al.]

without remedy? If one tenant in common extract the ore from the mine, or convey it from the surface of the earth to his furnace and convert it into iron, we can see no reason why the other shall not have a remedy to recover his half of its value, as to him it is destroyed, unless indeed he became a tenant in common of the iron made, a position the manufacturer will scarcely assume.

Although the Court of Chancery has refused an account by one tenant in common against another for cutting timber unless an injunction is prayed to stay waste, yet it is held that they will for ore taken. Lord Hardwicke says: "The courts always distinguish between digging of mines and cutting of timber, because the digging of mines is a sort of trade, and there are many cases where this court will decree an account of ore taken, when in any other tort or wrong it has refused relief" (Ambler, 56). The same case in 3 Atk. 264. The same principle is asserted of a colliery, 2 Atk. 630; 1 Ves. Sr. 233. These cases are approved in Parrot *v.* Palmer (3 Mylne & Keene, 632, 106 and 663, 340). See also Colyer on Mines, pp. 127 to 131. In 1 Jacob & Walker, 301, 2, mining is said to be a species of trade, and when it cannot be carried on advantageously by all the tenants in common, the court will appoint a receiver. The cases in Ambler and 3d Atk. are also approved by the chancellor in this case. But the position is assumed that the business of obtaining this ore is not mining, as it is not conducted under ground, but on the surface. It has been held in England under their tax laws, that a slate work is not a mine (2 East, 164). So of a lime work (1 East, 534). But where a shaft was sunk and limestone worked out under ground, held to be a mine (2 Barn. & Adol. 65; 22 Eng. C. L. 24). So where a peculiar clay was obtained in like manner, held to be a clay mine (3 Barn. & Adol. 424; 23 Eng. C. L. 110). And it is said that the expense of sinking a shaft will much exceed £5000 (7 Exchequer, 180).

In coming to these conclusions, the English courts doubtless had in view the customs of their country. Few, if any, of their valuable minerals are now found on the surface of the earth, and probably never were, but are obtained from great depths and are generally under the water-level. On the contrary, in most parts of the United States, the iron ore is obtained on or near the surface, above the water-level, and is worked by sunlight. Such is also the case in regard to coal in many places, whilst in others shafts are sunk to a considerable depth, and the mineral obtained by drifting, as mines are worked in England. But few, if any, of these shafts cost £5000 to sink. Our idea of mining is derived from our own habits and customs, hence our most approved lexicographer, Webster, says that a mine is "a pit or excavation in the earth, from which metallic ores, mineral substances and other fossil bodies are taken by digging." A miner is one who

digs for metals and other fossils and minerals, "a matrix or vein of metals," "a body destitute of organization and which naturally exists within the earth *or at its surface.*" Bouvier, in his Law Dictionary, defines a mine, "an excavation made for obtaining minerals from the bowels of the earth." And Jacob's Law Dictionary, by Tomlin, says, that "mines are quarries or places whereout anything is dug," and mineral, "anything that grows in mines and contains metals." Barber's Law Dictionary says, "It is held to have the sense of quarry."

Such is the sense and meaning to the word mine and mineral by Parke, B., in 14 Mees. & Wels., 872, and by Dr. Johnson, in his Dictionary. We have dwelt more particularly on this branch of the case, because the counsel seemed to consider that much depended on establishing that taking the ore from the mine-holes described in the bill and answers was not mining within the decisions which require an account. It certainly is not mining under the English tax laws; but to us it appears that it clearly is such, under the decisions requiring an account between tenants in common. The foundation of the rule is, that the joint property is taken by one tenant in common and converted to his own use, either by a sale of the material, or its conversion into another substance by manufacturing. The ancestors of the present parties always designated the property held in common as ore-banks and mine-hills, and the separate occupancy of each tenant is, in the proceeding in partition, and has probably ever since been called "*mine-holes.*" It is very true that such an appellation would not change their nature, but it tends to show that the parties understood them to be *iron mines.*

The statute of 4 Anne, ch. 16, § 27, provides in substance that actions of account shall and may be brought and maintained by one joint tenant and tenant in common, his executors and administrators, against the other as bailiff, for receiving more than comes to his just share and proportion, and against the executor and administrator of such joint tenant in common. This statute is decided to be in force in our State (3 Binn. 625, Report of the the Judges; Griffith v. Willing et al., Idem, 317; Irvine v. Hanlen, 10 S. & R. 220–1).

We take this to be a remedial statute, and therefore it should be liberally construed. The mischief existing before its passage was, that whoever could first obtain possession of a personal chattel would retain it until his co-tenant could, by some chance, get his hands on it. Whoever could first possess himself of a field would cultivate it to the exclusion of his co-tenant, until the latter could, by chance, find it unoccupied, when he would seize and hold a similar possession, neither being accountable to the other for any profits. This was all manifestly unjust, and led to a constant scrambling after possession. The statute was intended to

furnish an ample remedy. Soon after its passage it was decided that you could not declare against the party as a general bailiff, but he must be held specially under the act, was merely a special bailiff (Willis, 208; Viner's Abr., vol. xiv, pp. 513 and 514). Such is also the rule in American courts (12 Mass. 149 to 154; 10 Sergt. & Rawle, 219). But these cases go merely to the form of the action; the right to maintain it in some form has never been questioned. In some particulars the statute has received a liberal construction, being decided to extend as well to personal property as to real estate. In others it has, as we conceive, been construed over strictly by the English courts; has been, in fact, frittered away, so as to confer but little, if any, benefit in ordinary cases. In Henderson v. Eason (9 Law and Equity Reports, 337), it is held, that if one tenant in common occupy the land, farm it as his own, and take the whole share of the produce for his own benefit, his co-tenant cannot maintain an action of account under the statute, by reason of the former having taken more than his just share and proportion. That the statute only applies where he has *received* more than his just share from others. The decisions amount to this, if one part-owner of a ship take it away and detain it for a whole year, or more, making great profits by its use, he cannot be called on by his co-tenants to account for such use. If he hire it to another he may. If one tenant in common of a farm enter upon it, and cultivate every field, by reason of which no part is left to his co-tenants, he cannot be asked to account. If he rent it out, payable either in money or kind, he must pay each co-tenant his portion. It is held in Beer v. Beer, in the same book, p. 468, that where tenants in common lease their land, and after the death of one the other receive more of the rent than his share, the executors of the deceased can recover in account. In Brigham v. Eveleth (9 Mass. 538), it is held that where two were joint owners of a machine, and one used it for a considerable period, that assumpsit lay for its use. So in Jones v. Harrodson, where one part-owner in possession of a ship made a profit by it, held, that the other could recover his part in assumpsit (9 Mass. 540, in note). The court there say, that the statute of Anne is a remedial one, and ought to receive a liberal construction; and so Lord Holt declared soon after its passage. It was intended to give a remedy which did not exist at common law. Again in 3 Pick. 420, the part-owner of a ship was permitted to recover for a share of the profits made while it was in the occupancy of the other part-owner. In 9 Pick. 34, it is decided that if one tenant in common of a wood cut off and sell a portion, his co-tenant can maintain assumpsit for money had and received.

In 1 McMullen's Chancery Reports, pp. 69, 75, 298 and 475, it is held that an occupying tenant in common is not bound to account for the profits of land rendered productive by his labor.

[Coleman v. Coleman et al.]

He is entitled to that which was cleared and cultivated when he took possession. In our own State (Griffith v. Willing et al., 3 Binn. 317), it is said that partners in trade can have account render against each other by the common law, and tenants in common by virtue of the statute of Anne, and that is applied to a ship used by one of the part-owners. In Steffen v. Hartzel, one tenant in common of a limekiln was permitted to recover against the other, who had the sole occupancy, and Judge Huston says that account render is the proper remedy (5 Whar. 448). In Anderson v. Greble (1 Ash, 136), it is held by Judge King that one tenant in common is bound to account to the other for profits made out of the land, under the statute of Anne, and is entitled to a deduction for taxes, repairs, etc. Very many other decisions might be cited both in England and in this country to the same effect. I am unable to see the difference between the entire occupancy of a ship, a horse, or a machine, by one of several joint-owners, and that of a farm, provided the possession of the occupant be equally exclusive. If possession be taken of one of several fields, and a like quantity and quality of the improved land be left for the other co-tenants, the failure to take possession and use the property may arise from the default of the other part-owner. But where the possession is sole and entire, of the whole farm, I cannot understand why the person thus deriving the whole benefit from the joint property, should not be as well liable as if he had leased the land for a portion of the crop, or for money, to a third person. Or why he shall not be held to account when he reaps the profits with his own hand, as well as if he receives it through the hand of the tenant. In neither case is he held liable under the statute for any more than the sum actually received, nor until the amount is known, whilst a bailiff at common law is answerable for all that he might have received. Yet in 2 Phillips, 127, McMahan v. Bramhill, it is said in chancery that occupancy by one of several tenants in common of an estate, unaccompanied by exclusion, will not make him liable for rent to his co-tenant.

We are not called on to decide, in the present case, what the law would be if these ore-banks were a farm, as the law is clearly settled in England to be different as to mines. Bainbridge, in his "Law of Mines," says (pp. 70 and 71), tenants in common can work mines together, or either can refuse to work, and in that case have an account of the profits; again, at pages 403–4, where a mining concern was held as land, either of the owners might terminate the joint working, and if one continued to work he would be liable to account to the other (4 Younge, 42). And in mining transactions the court will decree an account even in partnerships, without decreeing a dissolution, which is contrary to the general rule (Bainbridge, 401, 402, 403; Colver on Mines, pages 127 to 131).

[Coleman *v.* Coleman et al.]

We are therefore of opinion that tenants in common of land containing mines, or deposits of minerals, can be obliged to account to each other for such minerals used or sold, either under the statute of Anne or independent of the statute.

We will next proceed to consider the effect of the 24th section of the act of April 25th, 1850.

That act declares: "In all cases in which any coal or iron ore mines, or minerals, have been, or shall be held by two or more persons as tenants in common, and coal or iron, or other mineral, has been or shall be taken from the same, by any one or more of said tenants respectively, it shall be lawful for any one of said tenants in common to apply by bill or petition in equity, praying that an account may be decreed and taken of all coal, iron ore, or other mineral, taken by said tenants respectively." The act then prescribes the method to be pursued by the court to compel an account, and "that they shall cause to be ascertained the quantity and value of the said coal, iron ore, or other mineral, so taken respectively by the respective parties, and the sum that may be equitably due, by and from, and to them, respectively, according to their respective interests in the lands," etc., etc. This statute has not, as yet, received a judicial construction by the superior court of our State, except so far as it is noticed by Justice Woodward in his opinion delivered when the titles of the present parties were before the Supreme Court, in 7 Harris, 110, 111, and 112; it is there declared that the parties can, at any time, compel an account, under the act of Assembly. The law is highly just and beneficial, was passed to remedy a supposed defect in the common law and the statute of Anne, and should be liberally expounded. It is said in the argument not to create a right, but to give a remedy. It is the right of any one to have the full benefit of his ownership in lands. If a tenant in common, having but a comparatively small interest in the minerals, shall use or sell a much greater quantity than he who has a larger interest, it is just and equitable that he should be paid for his loss, and the other's gain. An equitable right may exist without a remedy, and it is competent at any time for the legislature to provide one. It is a duty they owe to the citizen to furnish it. That has been done by the act of 1850, in language too plain to be misunderstood.

The defendants say that they have taken no more than their share from the whole mass of ore, and until they do so the plaintiff is without a remedy, but can himself sell or use until the shares are equalized; and they also aver, that for all practical purposes the bank is inexhaustible, and it cannot be shown for generations to come how much each is entitled to receive. These two positions, as we conceive, destroy each other. If sound, the man who has but one share is as well situated as he who has the

[Coleman v. Coleman et al.]

other ninety-five, into which those shares are said in the bill to be divided. He may safely sell and use his hundred tons per day, whilst the greater owner is using but ten, and cannot be called to account until that which is "practically inexhaustible" is exhausted. He and his descendants may enjoy it for generations to come before it can be ascertained that they have worked out their share. The act of Assembly contemplates no comparison or apportionment between the respective shares and the whole mass, but that the quantity taken or used by each tenant in common shall be ascertained, and if one has used more than another he shall account according to their respective interests or portions in the land. There is no mention of the respective shares, or proportions of the parties, in connection with the whole property, but of their relative proportions to each other. The statute of Anne speaks of one receiving more than "his just share or proportion," which by possibility might be construed to mean, of the whole estate, or quantity held in common, but our act of Assembly will admit of no such construction. We do not believe the statute of Anne has ever been so understood, and should such be the decisions under it, it might as well be repealed in relation to mines, as it cannot, in one case in a thousand, be ascertained how far the mass of ore or coal extends, whether the mine will prove to be continuous or inexhaustible, or may suddenly break off or run out the next day. In settling for ore dug, or timber cut and sold, under the statute, the parties have always been held to account according to their respective interests, and the quantity mined or sold, and not the quantity left in the ground, or on its surface, has been the measure of liability.

From what has already been said, it may be seen that we consider these parties bound to account to each other, not only for the ore sold, but also for the portions used by each respectively, and this both according to the principles established in courts of equity relating to mines, and also by a true and proper construction of the statute of Anne. Under the act of 1850, no distinction is made between that used and sold; it is sufficient that it be taken from the property held in common.

By the agreement of 1787, under which partition was made of other parts of the real estate, it was stipulated that the ore-banks and mine-hills, together with certain other ores in the vicinity, should remain as a tenancy in common. To this estate is incident all the rights of the property so held, except that of partition, to which it is decided not to be subject in Coleman v. Coleman (7 Harris, 100), although it is declared in the same case that the parties can be obliged mutually to account with each other for the ore used.

The fact relied on by the defendant to defeat this bill, that this is not an ordinary tenancy in common, and therefore an ac-

[Coleman v. Coleman et al.]

count cannot be demanded, operates, in our opinion, against the position. If the respective owners cannot enforce partition, it strengthens their right to an account. It is said by the Lord Chancellor, in 7 Ves. p. 589, that an injunction will not be granted by one tenant in common against another, for he has a right to occupy as he pleases. Because, says the same court, in 2 Dick, 667, if dissatisfied, he might obtain partition. Nor can the right of each party to his separate mine-hole deprive the others of the right to have the amount of ore taken from the common property and receive compensation, if the same exceeds the just proportion of the party taking. That arrangement was to prevent confusion in working the mines, and the parties and their workmen from interfering with each other. To say that the occupancy of a mine-hole would give the occupant an exclusive right to all the ore that could be taken from it without liability to any one, would be to encourage the party who owned but one-sixth to cover the whole face of the hill with mine-holes and work the same *ad libitum*, forever, to the exclusion of those who owned five-sixths. This method of assigning each party a settled location to pursue his labor was correct and proper in itself, but should not have given to it a greater effect than was intended by the parties. A much more potent objection to this bill arises from the long period of time that this system of mining has been conducted without any account being demanded by either of the various parties in interest. A reason may, however, be stated for commencing this proceeding in 1851, when the bill was filed, which did not exist for any considerable period before. It is averred in the bill, and the fact conceded, that until about the year 1848, no ore of any kind was sold by either of the parties in interest, and since that period large quantities have been sold by some of the defendants. It also appears that within a few years many new and very extensive furnaces have been built by all of the part-owners, requiring a greatly increased supply of ore, consuming more annually than was used by any furnace under the old system in many years. Until within some twelve or fifteen years before suit brought, no ore was mined except what was required to supply the furnaces erected on the ground held in common by the ancestors of the present owners; since then, new ones have been constructed on other soil and at various places. Where a common property has been long used in a particular and uniform manner, without any account being required or demanded, it is fair to presume that a contract or understanding existed between the parties that no accounts should be kept or claim presented. But when, at an after period, a new course of business is commenced, we may fairly presume that from thenceforth the parties expected to enter upon a different system, especially if thereafter a much greater consumption of the common property by either of the parties is shown.

[Coleman *v.* Coleman et al.]

It is not just that after such change any of the parties should be barred by what had passed *sub silentio* merely.  Some of the defendants seem to have been so strongly impressed with the equity of the plaintiff to have an account of the ore consumed or sold after the 1st of April, 1848, that they entered into an article to account for five years, at a price fixed in the contract.

None of the objections presented are, in our opinion, available, and the plaintiff is entitled to have an account as prayed.

Messrs. Robert and G. Dawson Coleman aver in their answer, that when they made the contract of March 13th, 1849, " it was understood by all the parties thereto, that all claim to any account prior to said agreement, for ores so taken, mined, or carried away, was abandoned," and any right or claim for ores so dug prior to the time fixed in the article (April 1st, 1848) was waived.  This is not gainsaid or disproved by the claimant; consequently that must be fixed as the time for commencing the account between all of the Messrs. Colemans, parties to the contract; and the account as between them must be taken according to the terms of the article so long as it continued in force, and according to the actual value of the ore used or sold by the respective parties from that time until the account is taken.  We understand from the argument that the Messrs. Grubbs are satisfied to have the account taken from the same period.  It is, therefore, so ordered.  But as between them and all of the other parties, the price fixed on the ore is not binding, and the same must be computed according to its actual value.

The Messrs. Colemans must be charged, in their account with the Grubbs, with all the ore taken by Robinson & Brooke, under the reservation in the deed from Peter Grubb and wife to Robert Coleman, by which the former secures to himself, his heirs and assigns, forever, the right "to dig, take, and carry away sufficient quantity of iron ore for the supply of any one furnace," etc., and which right is now conceded to be vested in Robinson & Brooke. The burden descends on the heirs of Robert Coleman, and must be charged to those claiming under him in the proportion of their respective interests in the property.

The controversy between the plaintiff and Robert and G. Dawson Coleman might have been settled at law when this bill was filed, by an action of covenant on the article of agreement, and therefore equity should not take cognizance of the case; but as a settlement with Messrs. Grubbs was necessary and proper, and that could only be effected by a bill in chancery under the act of Assembly, the present proceeding was rightly commenced.  The act of 1850 requires all the parties in interest to be made parties to the bill and brought in to answer, and chancery having the sole jurisdiction as to part of the case, the well-established practice enables us to take cognizance of the whole and settle the entire

contest. It is true that assumpsit for money had and received will lie where a portion of the common property is *sold* by one of the tenants, but the rule is different as to that *used* by the parties.

Where one tenant in common of a ship received the whole sum at which it was hired for a year, assumpsit lies by the other tenant in common, and he is not driven to his action of account or bill in equity (25 Wend. 409; 2 Caines, 166; 15 John, 12, 159; Wheaton's Selwyn, 79; 9 Mass. 538; 3 Pick. 420). But in this form of action the actual receipt of the money must be proved; under the act of 1850 it need only be shown that either party *took* the common property, and he must account for its value to his co-tenants.

It is our duty to decree that an account be taken in this case according to the principles we have laid down, and it will be referred to a master for that purpose. On the coming in of the report, it may become necessary to make an order as to the method of keeping the accounts, and settling between the parties hereafter.

## DECREE OF THE COURT.

And now, to wit, October 21st, 1858, this cause came on to be heard on the bill, and several answers of the defendant, and was fully argued by counsel, and submitted to the court, whereupon, the court did take time to consider of the same.

And now, to wit, January 6th, A.D. 1859, on due consideration thereof, it is ordered, adjudged, and decreed, that a full and true account be taken between the parties above stated, of all copper and iron ores taken or sold by them, or any of them, from the "Cornwall Ore-Banks and Mine-Hills," of which they are tenants in common, in the proportions stated in the bill, and it is further ordered, adjudged, and decreed, that it be referred to a master in chancery, to take and state an account between the said William Coleman, Robert Coleman, G. Dawson Coleman, Edward B. Grubb, Clement B. Grubb, and Robert W. Coleman, touching and concerning the several matters of account in said bill, and answers mentioned. That in taking said account, the said master commence with the first day of April, 1848, and charge each of said parties with all copper or iron ore, taken, used, or sold from their common property, described in said bill and several answers, and for the purpose of stating said account, the said Robert W. Coleman and William Coleman be taken as one party owning together fifty ninety-sixth parts, and no account to be stated between them. That Robert Coleman and George Dawson Coleman be taken as one party, owning together thirty ninety-sixth parts, and that no account be taken between them; and that Edward

[Coleman *v.* Coleman et al.]

B. Grubb and Clement B. Grubb be taken as one party, owning sixteen ninety-sixth parts, and that no account be taken between them ; but that each of said parties, divided as aforesaid, account to the other, according to their respective portions in the common property, as aforesaid. That in taking said account between the said Robert W. Coleman and William Coleman on the one part, and Robert Coleman and George Dawson Coleman on the other part, between the first day of April, 1848, and the first day of April, 1853, the master be governed and guided by the terms and conditions of the article of agreement entered into between the parties on the 13th day of March, 1849, and so far as the account has been stated and settled between the parties under that article, he is not to travel into the same. And, from and after the expiration of the article, each of the parties is to be charged with the iron and copper ore taken, used, or sold by them respectively, according to its actual market value, at the time of taking, using, or selling the same. That in taking the account between the said Edward B. Grubb and Clement B. Grubb, and the said Robert W. Coleman, Robert and George Dawson Coleman, the respective parties be all charged with the quantity of copper and iron ores taken, used, or sold by them respectively, according to its actual market value, at the time of so taking, using, selling, or otherwise disposing of the same, and in stating that portion of the account the said Colemans are to be charged with all iron ore taken or used by Robinson & Brooke, or either of them, under the reservation contained in the deed from Peter Grubb and wife to Robert Coleman the elder, of "sufficient ore for the supply of one furnace;" said ore to be charged to them in the proportion of their respective interests in the ore-banks, and at the actual market value at the time of taking the same. And for the better discovery of all the matters aforesaid, the said parties are to produce before the said master (upon oath) all books, papers, writings, or documents in their custody or power, relating thereto, and to any portion or part of said account, as the said master shall direct, and the said parties, or any of them, shall be examined under oath before the said master, or on interrogatories, as he shall direct, and he shall also compel to come before him, such witnesses, and examine the same under oath or on interrogatories, as he may see proper, and in his report, shall be at liberty to state such special circumstances as he may deem expedient and necessary. And the said master is required to make report to this court upon the matters hereby referred to him and to state a full account with all convenient speed. And the court doth reserve the consideration of the costs of this suit, and all further directions, until after the master shall have made his report, when either party may be at liberty to apply for a further decree or order.